## ROBEDEAUX v. STATE.

No. A-11372.   June 6, 1951.

(232 P. 2d 642.)

172

A. H. Huggins, Norman, and Leonard G. Geb, Ponca City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, William Cecil Robedeaux, hereinafter referred to as defendant, was charged by information filed in the county court of Kay county, with the offense of operating a motor vehicle while under the influence of intoxicating liquor, was tried before a jury and convicted, but his punishment was left to the court, who assessed the penalty at 90 days confinement in the county jail at Newkirk, to pay a fine of $300 and costs, and that defendant's drivers' license be suspended for a period of one year. Defendant filed a timely motion for new trial and motion in arrest of judgment, which were overruled and appeal was duly perfected to this court.

Some 14 errors are set out in petition in error, which are grouped and presented under six divisions in brief filed herein.

The charging part of the information reads:

" * * * that on or about the 2nd day of November, A. D. 1949, in said County of Kay and State of Oklahoma, one William Cecil Robedeaux did then and there unlawfully, wrongfully and wilfully drive and operate a certain motor vehicle, to-wit: a 1949 Buick Convertible Coupe, bearing 1949 Oklahoma License No. 50-1728, from a point unknown to a point more particularly described as between First and Second Streets on Cleveland Avenue in Ponca City, Kay County, Oklahoma, while intoxicated and under the influence of intoxicating liquor, contrary to the form and statute in such cases made and provided and against the peace and dignity of the State."

We shall first summarize the evidence and thereafter consider such assignments of error in this case as seem vital.

Taylor Lain, highway patrolman, testified that he saw the defendant shortly after 11 o'clock the night of November 2, 1949, driving a 1949 Buick car east along Grand street, in Ponca City and in front of the Grand Cafe. Witness testified:

"Q. And what did you first notice about the car? A. What directed my attention to the car was the abrupt stop and abrupt start almost immediately prior to the time he got to the intersection on Grand Avenue. Q. Did he just remain stopped? A. No, sir, started up immediately. That process was done twice. He did that twice. Q. Could you see him very well? A. Yes, sir It is light

there. The street lights are very good. Could see the driver plain. Q. Did you notice anything about him other than that? A. Yes, sir. He had a hat on and his hair was protruding from his hat more or less over the left side of his face. Q. Then after he stopped the second time did he remain stopped? A. No, sir. He started up again immediately, made a left turn on Second Street. Q. Did you continue to watch him while he made the turn? A. That all happened in a matter of seconds, it didn't take long. My first impulse was to go out and stop him afoot, but we couldn't do that so we went to our patrol cars. Q. Was he able to negotiate the turn all right? A. He made the turn, didn't hit anybody. He made a wide left turn."

Officer Lain and his partner, C. E. Crowder, got in their patrol car and followed the defendant, who drove through an alley near the Jens Marie Hotel, and the officers pursued the vehicle being driven by the defendant, which Officer Lain testified was being driven very slowly. He further testified:

"Q. Then what happened? A. We pulled up behind the defendant's car, giving the signal for stop which is the siren and red light. He stopped pulling to the right striking a parked vehicle with his right rear fender of his car and came to a complete stop. He just scratched this other car. Q. Then what happened? A. We asked the defendant to get out of his car. Q. Where did you park your car? A. We left it standing in the street, believe to the left and west of his car. Q. Did he have anybody in the car with him? A. Yes, sir. Blanche Wilson. Q. Did you ask him to get out? A. Yes, sir. Q. Did he have any trouble getting out? A. No, sir. He got out of his car but he was very unsteady about the whole procedure."

Witness stated that in his opinion the defendant was drunk and that he took him to the city jail. He stated that they released the lady as she was in no sense intoxicated.

Over the objections of counsel for defendant, witness was permitted to tell about finding two bottles of unopened wine, a four-fifths quart bottle with about a pint of whisky in it; also an empty ginger beer bottle, and a half pint bottle about one-half full, and a half pint flask with about an ounce of whisky in it, and two empty four-fifths quart bottles. Five of the bottles were admitted in evidence.

It was further developed that when the officers stopped the defendant that they drove up closely on his left and put the red spotlight on him and sounded the siren, which apparently frightened the defendant who in pulling in to the curbing at his right pulled too close to a parked car and defendant's right-hand rear fender slightly scraped the parked car, but not enough to break the paint. The officer stated that the defendant was very cooperative and gave him no trouble whatever. He stated that he could smell liquor on defendant's breath.

Fred Ather, desk sergeant at Ponca City, testified for the state and stated that when he booked defendant he showed evidence of intoxication. Counsel objected to the statement on the ground that the witness had not been qualified to testify as an expert, whereupon the court took over and proceeded to qualify the witness and propounded further questions.

C. E. Crowder, the second patrolman, testified substantially as had Officer Lain, and the court proceeded to qualify and question him, over the objections of counsel for defendant. On completing his questioning the court stated: "That's all. If that's not the way to qualify this witness, I wouldn't know how." The court on his own initiative and not at the request of the county attorney, caused the seals on the exhibits to be broken and the bottles to be handed the jurors to smell. The court on completion of the cross-examination of Officer Crowder by the state, asked him:

"Q. Did you know him, the defendant, prior to that date? A. Yes, sir. I had arrested him before. Mr. Huggins: Incompetent, irrelevant, and immaterial; prejudicial to this defendant's rights. By the Court: Sustained. I admonish you not to consider that last answer."

This completed the state's evidence. The court overruled defendant's demurrer to the evidence.

The defendant introduced evidence of persons who saw him and with whom he dealt on November 2, 1949. Ed Logan, who operated the White House Cafe north of Newkirk, and who had lived there for 35 years, testified that defendant and a lady had eaten at his cafe about 6:30 p.m., and he did not smell liquor on defendant's breath, though he was close to him, and did not observe him acting any way out of the way. Defendant purchased hamburgers and cokes for the lady and himself and purchased two more hamburgers, candy, gum and fritoes and said: "I am going to Chilocco to see the kid, and I want to take him some candy and stuff."

Mrs. Lucille Riddle, matron over small boys, at Chilocco, testified that defendant arrived there about 7 or 7:15 p.m. November 2, 1949; that she talked with him, smelled no liquor and that he did not act like a person under the influence of intoxicating liquor. He left about 8:10 p.m.

Mrs. Blanche Wilson testified that defendant drove to Oklahoma City on November 2, and got her to take her to Chilocco to see her son; that they drove by way of Newkirk and ate supper at the White House Cafe out on the highway, and got to Chilocco about 7:15, visited her son and left there about 9:15 for Arkansas City, where she bought a fifth of whisky; that she took a drink and that defendant took just three swallows and then they started to Ponca City; that she drank some more of the whisky but that defendant did not drink any more as he was suffering with liver trouble. She stated that defendant was driving around to locate her a room in Ponca City, where she had decided to stay a day or so and rest up, and that the wire fence prevented them from parking back of the Jens Marie Hotel in Ponca City and they drove on through the alley, that they were fixing to stop when the officers suddenly appeared and turned the red light on and sounded the siren. She stated that the defendant had curly, unruly hair and that the window was down and had disheveled his hair, but she denied that he was drunk or that he had violated any traffic laws or had driven the car in any way so as to cause the officers to arrest defendant.

On cross-examination witness stated that they stopped at the street intersection where the officers first noticed them so as to decide which way to turn to find her a stopping place. She denied that the car jerked or jumped. Witness was further cross-examined as follows:

"Q. Where do you live? A. Oklahoma City. Q. And you were just coming up to Ponca City to spend a day or so? A. I went to see my son. It was late so decided to get a room and rest up. Q. Have you seen quite a bit of Robedeaux? Mr. Huggins: Objected as incompetent, irrelevant and immaterial; prejudicial to the defendant. By the Court: Overruled and exception allowed the defendant. Q. You've had quite a few dates with him? A. Yes. Q. You were on a date this time? A. Yes. Q. You knew he was married? A. Yes. Mr. Huggins: Want to object to the question about being married; seeks to prejudice the jury. By the Court: Overruled. Exception allowed the defendant."

Defendant testified in his own behalf, stating that he drove from Tulsa to Oklahoma City on November 2 to get Mrs. Wilson to take her to see her son at Chilocco, visited Chilocco and Arkansas City, Kansas, and then drove to Ponca City, a total of 340 miles, that he was trying to get in the parking

yard back of the Jens Marie Hotel like he had before but a wire fence prevented it. He denied that he was drunk or was having trouble with his car, stated that he only took three swallows of whisky at Arkansas City some three hours before his arrest; denied that he was a whisky drinker. On cross-examination he was asked by the county attorney:

"Q. Mr. Robedeaux, ever been convicted of a crime? A. No, sir. Q. Sure? A. Yes, sir. Q. Are you married? A. Yes, sir."

The first inquiry is whether or not the officers were justified in stopping the defendant for investigation of his driving and of his condition as to intoxication following their attention being attracted by a set of circumstances that indicated to them that something was wrong with the driver of the car. The basis for their arrival at the concerted judgment that the driver of the observed car was intoxicated was recited to the jury. It may be that the indications stated, in most instances after further investigation, would prove to be an erroneous basis for the conclusion of intoxication. We do not know. But we recognize the specialized training and professional qualification of the state highway patrolmen for their peculiar duties. And we do know that by reason of the appalling death rate on the streets and highways of this state, officers should be encouraged to be ever alert in the program of reducing to a minimum the accidents, maimings and deaths caused by the inebriated driver. The task is not an easy one. Mistakes will sometimes be made. Patience and the co-operative spirit is required of the general public if the program is to succeed. The utmost good faith is at all times required of the officers. The jury will ultimately pass on the intoxication or nonintoxication of the person charged.

In the within case, had the officers not detected the odor of whisky on the breath of the defendant after they had stopped him, clearly they would not have been justified, from the evidence recited, in detaining him further or of searching his car. But here, defendant by his own admission, had liquor on his breath. The amount and its effect on the user was a question of fact. A certain quantity of liquor will affect a person differently at different times, depending on his physical condition, etc. It was for the jury to determine whether the defendant had consumed enough liquor for it to so affect his driving as to support the charge for which he was being tried. Butler v. State, 87 Okla. Cr. 369, 198 P. 2d 221.

Having determined that there was a lawful arrest, under the circumstances set out and not dependent on the liquor subsequently found in the vehicle, it follows that the search and seizure of the contraband liquor was lawful. It developed that some person or persons had consumed a quantity of liquor by reason of several flasks being practically empty. The four-fifths quart admittedly purchased in Arkansas City by the driver's companion a few hours before was about half full. These items in possession of the accused, though incidentally corroborative of the charge of intoxication, would be of aid to the jury in determining the extent of the intoxication of the defendant, and were received in evidence for that purpose. The only objection interposed at trial was that the evidence was incompetent, irrelevant and immaterial, and prejudicial to the rights of the defendant. No demurrer was interposed to the evidence when the state rested and no motion to suppress was interposed, and the trial court was never apprised of the objection now raised. The question of whether the evidence was obtained by unreasonable search and seizure cannot be raised for the first time in this court. Barnett v. State, 31 Okla. Cr. 413, 239 P. 680; Rosser v. State, 55 Okla. Cr. 185, 26 P. 2d 769; Gragg v. State, 72 Okla. Cr. 189, 114 P. 2d 491.

With the above eliminated, there still remain serious issues involving the question of whether or not the defendant received a fair and impartial trial. We have often said that the law of the land guarantees to every person accused of crime, whether guilty or innocent, a fair and impartial trial according to the due and orderly course of laws, and that it is the duty resting upon the courts to see that the guaranty of such a trial shall be upheld and sustained. Hill v. State, 76 Okla. Cr. 371, 137 P. 2d 261; Ex parte Barnett, 67 Okla. Cr. 300, 94 P. 2d 18; Garrett v. State, 74 Okla. Cr. 78, 123 P. 2d 283.

Herein there was a close question whether the officers were justified from their more or less limited observation of defendant at the inception of their investigation in their conclusion of his intoxication. And while there is evidence to support the verdict of the jury, evidently there was some doubt in the minds of the jurors as they could not decide upon the amount of the punishment, and left this to the court. And the court in view of the fact that the defendant was not actually violating any traffic ordinance, but was driving slowly and carefully at the time of his arrest, even though his driving and appearance was such as to support the conclusion of the officers that he was under the influence of intoxicating liquor, was most severe in punishment assessed. No accident was involved. The record would indicate this to have been a first offense, no previous conviction being shown. Yet the court assessed a heavy penalty. He went further and exceeded his jurisdiction by attempting to revoke the defendant's drivers' license for one year, when this is a duty imposed by statute upon the Commissioner of Public Safety. 47 O. S. 1941 § 295. Thrasher v. State, 94 Okla. Cr. 105, 231 P. 2d 409; State v. Moyers, 86 Okla. Cr. 101, 189 P. 2d 952.

These facts will not be left unnoticed in considering the hereinafter matters urged by counsel for the defendant. It is contended that "the court erred in showing undue diligence in the prosecution of this case by asking questions and qualifying witnesses, all of which had a highly prejudicial influence with the jury, and to which action of the court this defendant excepted."

Counsel for defendant points out a series of acts by the trial judge to support their contention that the judge did indicate to the jury his opinion of the merits of the case by admitting in evidence the five liquor bottles when the county attorney had not yet moved for their admission, and thereafter ordering the county attorney to break the seals and pass the exhibits around to the jurors to smell the contents, and also taking over and qualifying state witnesses, asking them leading questions, and on completion of qualifying Officer Crowder, stated: "That's all. If that's not the way to qualify this witness, I wouldn't know how."

All of the above considered together tends to support the contention of counsel for defendant.

In Little v. State, 72 Okla. Cr. 273, 115 P. 2d 266, this court said:

"It is the duty of the trial courts to refrain from in any manner, either through their actions or words, to indicate to the jury their opinion upon the merits of the case being tried before them. For that reason, except when it appears absolutely necessary to the administration of justice, the trial judge should not interrogate witnesses. Generally, the trial court will be motivated only by a spirit of fairness when he proceeds to ask questions of a witness, but often a lay jury is apt to confuse the actions of the court and become impressed that the court has an opinion upon the merits of the case, which he is trying to convey to the jury."

See, also, Coffe v. State, 59 Okla. Cr. 121, 56 P. 2d 1194; Hill v. State, 71 Okla. Cr. 371, 137 P. 2d 261; Harrison v. State, 11 Okla. Cr. 14, 141 P. 236; Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann. Cas. 1916A, 689.

It is further contended that the court erred in permitting the county attorney to inquire into the marital status of defendant's witness and companion at the time of his arrest, Blanche Wilson, and of the defendant. The objectionable cross-examination had already been set out herein. It tended to show that defendant was a married man and had been dating Blanche Wilson and driving her over the country and that she knew defendant was married, though there was no indication whether or not defendant and his wife were separated.

Counsel objected to this line of evidence as being prejudicial, but the court overruled the objection. Counsel then moved the court to declare a mistrial, which was also overruled.

When the defendant took the stand to testify in his own defense, the county attorney on cross-examination further pursued this line of questioning, asking defendant: "Are you married? A. Yes, sir."

For the limited purpose of cross-examination of a female witness for accused, it has been held that her relations with accused may be shown to indicate her bias in his favor. It is for the purpose of affecting her credibility. Sights v. State, 13 Okla. Cr. 627, 166 P. 458, 459; Starks v. State, 67 Okla. Cr. 156, 93 P. 2d 50. If witness would knowingly consort with a married man, such disregard for convention would have some bearing on her bias in his favor. We do not think, however, that the county attorney should have followed up the subject by questioning the defendant along this line, the relationship recited by witness Blanche Wilson being undisputed.

The county attorney also in the cross-examination asked defendant:

"Q. Mr. Robedeaux, ever been convicted of a crime? A. No, sir. Q. Sure? A. Yes, sir."

Officer Crowder, a witness for the state, had been asked by the court:

"Q. Did you know him [the defendant] prior to this date? A. Yes, sir. I had arrested him before."

Of course, the officer knew that the answer was improper where there was not a conviction. Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809. The court on objection had admonished the jury not to consider this answer. Nevertheless, viewed in connection with the accusing question of the county attorney, such interrogation was prejudicial in the absence of the county attorney offering proof that defendant in fact had been convicted. Klaassen v. State, 39 Okla. Cr. 402, 266 P. 495.

Considering the initial weakness of the state's evidence to sustain the officer's conclusion that defendant was driving his car improperly and had the appearance of being intoxicated, and recognizing that whereas the action of the court and the county attorney, complained of, under stronger circumstances, would not be sufficient error to work a reversal of the case, or at most only a modification, in the instant case we have doubt of whether the jury would have convicted the defendant had the action of the trial judge complained of not taken place, and had Officer Crowley and the county attorney not injected the prejudicial matter mentioned. Therefore, we cannot say that the defendant received that fair and impartial trial guaranteed to persons accused of crime, and by reason of defendant's rights being prejudiced in the respect as set out, he is entitled to a new trial.

The case is reversed and remanded and defendant is granted a new trial.

BRETT, P. J., and JONES, J., concur.