## Frank v. Frank

*Stanley W. Katz* and *Leon P. Haller,* of *Davis, Katz, Buzgon & Davis,* for plaintiff.

*Frederick S. Wolfson,* of *Egli, Walter, Reilly & Wolfson,* for defendant.

GATES, P. J., February 27, 1973.—As of January 1, 1973, 22 States, including Pennsylvania, have ratified the Equal Rights Amendment to the United States Constitution.

The first section of the amendment provides that: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."

The citizens of the Commonwealth of Pennsylvania, in an unusual display of leadership as legal libertarians, have already adopted such an amendment to the Pennsylvania Constitution. Effective May 18, 1971, in this Commonwealth, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual": Article 1, sec. 27.

Because of this, defendant in this divorce proceeding asks us to hold as unconstitutional the Pennsylvania law which allows only a wife to obtain a divorce from

bed and board, together with alimony, from a husband guilty of enumerated acts of marital misconduct.

Unquestionably, the Equal Rights Amendment was conceptualized to assure women equal rights with men. But in a case by case implementation of the amendment, we are quite aware that we are treading with sneakers in virgin territory, and, as here, men will seek their notion of equal rights with women. We fear that if we interpret the Equal Rights Amendment as simply as would a country preacher the Bible, we will space out social theories beyond the point of workability.

What then did the framers of this amendment intend to accomplish by its adoption and ratification? Surely, men and women are different and no quantity of words or quality of thought will ever change that. Our citizens, we presume, did not intend to do the impossible. Of course, they did intend to assure women equal rights in the field of employment policies and practices, etc. But we seriously doubt that it was in their minds to drastically alter the role of men and women in the family unit. We do not believe it was ever intended to destroy the marital concepts with which we have lived in this Commonwealth for so many years. If we are wrong, that edict will have to come from someone closer to the throne. We refuse to be pioneers on a journey that will surely destroy the family if the Equal Rights Amendment is applied as defendant would have us do.

It has been suggested by some commentators that the Equal Rights Amendment will have a serious impact in such fields as criminal law, military service and domestic relations. It has been suggested that the amendment eliminates such well-established presumptions in our law as that of a mother having custody of tender aged children or girls. Commentators argue

that the Equal Rights Amendment will render invalid laws requiring a married woman to take the name of her husband. Others say that support and alimony laws will have to be revamped to avoid discrimination based on sex. Such well-established legal matters as real estate law, probate law, differing ages for parental consent to marry, grounds for divorce, laws requiring a wife's domicile to be that of her husband, and many others are likewise off the constitutional muster list, say the scholars. One writer suggests that a man will have a "right" under the amendment to wear his hair as long as women are permitted to wear theirs. Krauskopf, Sex Discrimination—Another Shibboleth Legally Shattered, 37 Missouri Law Review, Summer 1972, pages 377-408; Brown, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L. J. 871, 946 (1971); Davids, New Family Norms, Student Lawyer 18 (December 1972); Carlsson, Surnames of Married Women and Legitimate Children, 17 N.Y.L.F. 552 (1971).

To us, the most dreadful suggestion is that the Equal Rights Amendment will radically change the legal concepts which regulate the family unit. We are saddened by the thought that there are those who hail the arrival of the amendment and look forward with eagerness to the government or private day care centers raising the children of liberated men and women who consider homemaking and motherhood as discriminatory badges of inferiority. We see the products of this fuzzy thinking regularly in juvenile court. Behind every delinquent child we find a delinquent, albeit liberated, parent. Justice has a fair menu but on it we do not price liberation as highly as we do parenthood. Our experience has been that the family unit needs more legal support than women or men need absolute liberation.

Furthermore, the idea of liberty ofttimes produces incompatible things called by the same name. Ideologically, liberty is desirable while practically it may be unwanted. Abraham Lincoln, speaking to an audience at a Sanitary Fair in Baltimore in 1864, fingered the problem by telling his hearers: "The shepherd drives the wolf from the sheep's throat, for which the sheep thanks the shepherd as his liberator, while the wolf denounces him for the same act, as the destroyer of liberty . . . Plainly, the sheep and the wolf are not agreed upon a definition of the word liberty . . ."[1] Only when we agree as to the meaning of liberty, should we seek its purification.

Now we must focus on the problem. A divorce from bed and board certainly appears on its face to discriminate against men, since it is a remedy available only to women. The reason for the exclusiveness of the remedy arises not out of the concept of sex, but out of the duty and obligation of a wife to live with her husband. She may live apart from him only if he is guilty of marital misconduct.

The grounds for a divorce from bed and board are set forth in the Divorce Law of May 2, 1929, P. L. 1237, sec. 11, 23 PS §11, in the following language:

"Upon complaint, and due proof thereof, it shall be lawful for a wife to obtain a divorce . . . in the manner hereinafter provided in cases of divorce, that her husband has:

"(a) Maliciously abandoned his family; or

"(b) Maliciously turned her out of doors; or

"(c) By cruel and barbarous treatment endangered her life; or

"(d) Offered such indignities to her person as to

---

[1] Carl Sandburg, Abraham Lincoln, The War Years, Vol. III, page 41.

render her condition intolerable and life burdensome; or

"(e) Committed adultery."

Thus, in order for a wife to live separate and apart from her husband, she must prove her right by satisfying a court that her husband is guilty of one or more of the enumerated acts of marital misconduct. This does not terminate the marriage. There are ancillary proceedings which permit the reestablishment of the marriage or for a final divorcement of the parties. Meanwhile, the husband guilty of marital misconduct, not because of his sex, must support his wife if she is in need and if he is financially able to do so. The salutary feature of the procedure is that it is planned for an eventual reconciliation of the parties.

This procedure has long been a part of our law. See 2 Freedman, Law of Marriage and Divorce in Pennsylvania (2d ed.) §352, et seq. It is available to a wife, not because of her sex, but because of her duty to live with her husband except when he is guilty of marital misconduct. Defendant would now have us discard our long history of this incident of a Pennsylvania marriage by declaring it offensive to the Equal Rights Amendment. We encountered no difficulty in refusing to do so on at least one acceptable legal theory.

The right to be free from discrimination based solely upon sex is but one in the galaxy of individual constitutional rights. But, like all individual rights, it may be contracted away or waived.

When you are unmarried, you do not have to live with anyone. You owe no specific legal obligation to support anyone merely because of your sex. You retain your own name. You may associate freely with members of the opposite sex. You must love, honor

and obey no one merely because of your sex. Now these are valuable rights and if you want to retain them, remain single.

On the other hand, if you want to experience the joys of marriage and parenthood; if you want to be a part of and create an institution known as the family, you must surrender some of these valued individual rights. You do so by contract. You take an oath and surrender these rights. Your marriage ceremony and your continuance in the family unit is a waiver of those rights and an acceptance of the duties of a spouse as they have been described in our laws.

The United States Supreme Court has recognized the validity of a waiver of individual constitutional rights as valuable as, if not more so, the right to be free from sexual discrimination. You can waive your privilege against self-incrimination: United States v. White, 322 U.S. 694 (1944). You can waive your right to legal counsel: Moore v. Michigan, 355 U.S. 155 (1957); Commonwealth v. Ritchey, 431 Pa. 269 (1968). You can waive your right to a jury trial: Commonwealth v. Kramer, 146 Pa. Superior Ct. 91 (1941); Commonwealth v. Kirkland, 413 Pa. 48 (1963); Act of June 11, 1935, P. L. 319, as amended, 19 PS §§786 to 788. You can waive your right to a presentment or indictment by a grand jury: Hallinger v. Davis, 146 U.S. 314 (1892); Act of 1907, April 15, P. L. 62, sec. 1, as amended, 19 PS §241, held to be constitutional in Commonwealth ex rel. Withers v. Ashe, 350 Pa. 493 (1944). You may waive your right to confrontation of witnesses against you in a criminal case: Grove v. United States, 3 F.2d 965 (1925); Commonwealth v. Petrillo, 340 Pa. 33 (1940). You may waive your right to speedy trial: Murray v. State, 19 Okla. Crim. Rep. 322, 198 Pac. 973 (1921); double jeopardy: Levin

v. United States, 5 F.2d 598 (1925); and to compensation for land taken by eminent domain: Baehr v. Commonwealth, 30 Fayette 64 (1967).

Unquestionably, you can consent to a search of your property, surrender the privacy of your home, abstain from petitioning the government for a redress of a grievance, consent to soldiers being quartered in your home and waive your right to a speedy trial in a criminal case.[2] Why in the world then should you not be able to refuse to be a liberated man or woman? The answer, in our humble judgment, is that you can. Whenever, by oath, you gain the privileges of matrimony, you also accept the legal obligations incident to it. As between spouses, an effective waiver of the Equal Rights Amendment is accomplished by agreement. In this way, the traditional institution of marriage and the integrity of the family unit are preserved. At the same time, a citizen spouse enjoys the benefits of the Equal Rights Amendment as against all other citizens and in all other legal matters where sexual discrimination exists.

It has been called to our attention that our good friend and respected colleague, Judge John G. Brosky, of the Family Division of the Common Pleas Court of Allegheny County writing in Corso v. Corso, 59 D. & C. 2d 546, 120 Pitts. L.J. 183 (1972), disagrees with us. He is of the opinion that the Equal Rights Amendment nullifies the bed and board divorce procedure.

We are also aware that a majority of the judges of the distinguished bench of Delaware County concur with our scholarly friend and colleague, Judge Louis

---

[2] The waiver of constitutional rights may be accomplished actively or passively. For an array of such cases, or a "legion" of them, as lawyers are prone to say, see footnotes 8 to 12 found on page 588 of Commonwealth v. McGrogan, 449 Pa. 584 (1972).

Bloom, writing for the majority in the cases of Commonwealth ex rel. Luken v. Luken, May term, 1972, no. F-19-149 (support and maintenance laws) and DeRosa v. DeRosa, no. 7302 of 1972 (alimony pendente lite, counsel fees and expenses), wherein he believes these laws do not offend the Equal Rights Amendment. Although Judge Bloom takes a different channel, we arrive at the same port.

While our appellate brethren have not addressed themselves directly to the point, they have considered cases tried and argued months after the adoption of the Equal Rights Amendment in Pennsylvania and have affirmed the marital obligations created by the support laws: Commonwealth ex rel. Friedman v. Friedman, 223 Pa. Superior Ct. 66 (1972), tried in Philadelphia County in January of 1972 and argued before the Superior Court in September 14, 1972, 18 months after the adoption of the amendment; and the laws pertaining to alimony pendente lite, counsel fees and expenses; Kayaian v. Kayaian, 223 Pa. Superior Ct. 103 (1972), argued before the Superior Court on June 14, 1972, 13 months after the adoption of the Pennsylvania Equal Rights Amendment.

Of course, we recognize that these cases are not precedent for what we have done here. But if these laws are as offensive to the Equal Rights Amendment as Judge Brosky suggests and this defendant argues, it would probably not have escaped the attention of our Superior Court and they likely would have raised the issue sua sponte. More likely it is that they, like we, feel that any revision of the marriage and divorce laws existing in this Commonwealth is for the legislature and not the courts.

Be that as it may, it is our firm conviction that the Pennsylvania Divorce Laws pertaining to bed and board with alimony decrees, assuming, without decid-

ing, that they offend the Equal Rights Amendment, are nonetheless valid by reason of the agreement and waiver which flows from the contract of marriage. Therefore, defendant's preliminary objection to his wife's complaint in divorce from bed and board will be dismissed.

ORDER

And now, to wit, February 27, 1973, defendant's preliminary objections are dismissed and leave is granted to defendant to answer the complaint within 20 days from the date of the receipt of a copy of this order.